IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES GOLF LEARNING
INSTITUTE, LLC, et al.,

      Plaintiffs,

  v.

CLUB MANAGERS ASSOCIATION OF
AMERICA, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)

1:11CV869 (LMB/JFA)

## MEMORANDUM OPINION

This matter comes before the Court on defendants' motions to dismiss Counts I, II, and V.[1]  For the reasons discussed below, defendants' motions to dismiss will be granted and this civil action will be dismissed.

### I.   BACKGROUND[2]

Plaintiffs United States Golf Learning Institute, LLC ("USGLI") and William J. Kamm & Sons, Inc. ("WJK") are

---

[1] Plaintiff also moved to transfer venue of Count V to the Middle District of Florida [Dkt. No. 31].  For the reasons stated in open Court, that motion was denied and will not be further addressed in this Memorandum Opinion.

[2] To the extent that the Court recounts facts presented in the pleadings and exhibits submitted in connection with plaintiffs' motion for a preliminary injunction, these facts are intended merely to clarify the background of this action.  The Court has not relied on such facts in analyzing the legal issues in the motions to dismiss.

affiliated entities.  USGLI provides online training courses.
Compl. ¶¶ 9, 31.  Defendant Club Managers Association of America
("CMAA") "is a professional association for club managers,
including country, golf, yacht and city clubs."  Id. ¶ 10.
Defendant Professional Management Services Group, Inc. "provides
management company services, sales, marketing and other services
to various Human Resources Outsourcing Companies, which are
known collectively as the SCI Companies" ("SCI").  Id. Ex. 5 at
1.

     This case involves two contracts: the first between USGLI
and CMAA ("CMAA contract") and the second between WJK and SCI
("SCI contract").  In essence, plaintiffs argue that both
contracts contained exclusivity clauses which defendants
breached and tortiously interfered with by teaming up with each
other to develop and market an online educational product that
directly competes with USGLI's analogous product, the CLI.

     A. The CMAA contract

     On October 1, 2009, USGLI and CMAA entered into their first
one-year marketing contract, and entered into a second one-year
contract on November 11, 2010.  Compl. ¶¶ 11, 13.  The purpose
of that contract was to create an opportunity for USGLI to sell
training services, specifically an online risk management
training module, to members of CMAA and compensate CMAA for that
opportunity.  The parties further agreed to "work together to

jointly market USGLI's Risk Management Module, and other jointly-developed training modules, to CMAA members under a platform to be called Club Learning Institute" ("CLI").  CMAA was to receive a fixed price for each CMAA member that subscribed to the Risk Management Module or any other modules available on the CLI platform.  Sections III(c) and IV of the contract obligated CMAA to "use its resources to market" the CLI to its member clubs, to identify USGLI as "the provider of the services and training platforms," and to associate itself with the CLI by allowing the CLI to use the CMAA logo and the words "in collaboration with the Club Managers Association of America."   Under Section V, USGLI agreed to pay CMAA $500 for each CMAA member that purchased a subscription to the CLI.  In Section X(a) of the CMAA contract, CMAA agreed not to enter into agreements to create an online product similar to the CLI product for one year after the agreement terminated due to default by USGLI.

According to plaintiffs, the CMAA contract imposed on CMAA a requirement to offer its members online training only through the CLI program during the term of the contract and for one year post-termination, thereby prohibiting CMAA from partnering with other parties to provide online courses.  Defendants vigorously dispute that the CMAA contract imposed such an exclusive obligation to use the CLI.

The terms of the CMAA contract further provide that the contract automatically renews annually unless one or both parties gives notice of its desire to terminate the agreement at least 90 days before its expiration.  Compl. ¶ 21.  Plaintiffs allege in their complaint that pursuant to Section X(a), the effective date of the CMAA contract at issue was October 1, 2010 and, because neither party gave notice of intent to terminate before July 1, 2011, the contract has automatically renewed and remains in effect through October 1, 2012.  Id. ¶¶ 20, 22.

B. The SCI contract

WJK and SCI entered into an Independent Sales Producer Agreement on March 18, 2011, in which WJK agreed to promote SCI's services to CMAA members.  See SCI contract.  In exchange, SCI agreed to pay WJK commissions for each client WJK procured and to "exclusively promote" the CLI to CMAA members who were prospective SCI clients.  Id. §§ 3(a), 5.  In addition, SCI agreed to offer one free year of the CLI to CMAA member clients at SCI's expense.  Id. § 3(b).

C. CMAA University

Around July 6, 2011, CMAA began to offer and promote an online training program called CMAA University "in conjunction with SCI."  Compl. ¶ 23.  CMAA University is available on the CMAA website and offers online educational courses to CMAA members in a variety of substantive areas, some but not all of

4

which plaintiffs allege directly overlap with the CLI's offerings.  See id. ¶ 25.  Plaintiffs contend that SCI provides CMAA University the required online infrastructure as well as substantive content.  Id. ¶ 24.  SCI and CMAA both issued press releases promoting CMAA University.  Id. ¶¶ 26-27.

Plaintiffs filed a Complaint for Injunctive Relief and Damages on August 16, 2011, alleging breach of contract and tortious interference with contract claims against defendants and basing federal jurisdiction on diversity of citizenship.[3] Plaintiffs argue that some, but not all, of the CMAA University's offerings directly overlap with the offerings from the CLI and that CMAA is breaching its contract with USGLI by "offering and promoting a competing online learning platform to [USGLI's] Club Learning Institute."  Id. ¶¶ 25-28.  Finally, plaintiffs argue that CMAA and SCI are tortiously interfering with the other's contract with USGLI/WJK through their involvement with CMAA University.  Compl. Counts II and V.

On September 23, 2011, the Court denied plaintiffs' motion for a preliminary injunction and transferred Counts III and IV (against SCI on breach of contract claims) to the Middle District of Florida, pursuant to the SCI contract's mandatory

---

[3] Both plaintiffs are citizens of Illinois.  Compl. ¶¶ 2-3. Defendant CMAA is a Michigan non-profit corporation with its principal place of business in Alexandria, Virginia.  Id. ¶ 4. Defendant SCI is a Florida corporation with its principal place of business in Florida. Id. ¶ 5.

forum selection clause.  After that transfer, defendants filed
the pending motions to dismiss, which address the remaining
counts: Count I, by USGLI against CMAA for breach of the CMAA
contract; Count 2, by USGLI against SCI for tortious
interference with the CMAA contract; and Count V, by WJK against
CMAA for tortious interference with the SCI contract.

## II.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), a complaint should not be
dismissed "unless it appears certain that [plaintiff] can prove
no set of facts that would support his claim and would entitle
him to relief."  Smith v. Sydnor, 184 F.3d 356, 361 (4th Cir.
1999).  In evaluating a motion to dismiss under Rule 12(b)(6),
the Court must accept all of the complaint's well-pleaded
allegations as true and view them in a light most favorable to
the plaintiff.  Smith, 1184 F.3d at 361.  However, that
requirement applies only to facts, not to legal conclusions.
Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  In addition, "if the
well-pleaded facts do not permit the court to infer more than
the mere possibility of misconduct, the complaint has alleged -
but it has not 'show[n]'- that the pleader is entitled to
relief."  Id. at 1950.  "Factual allegations must be enough to
raise a right of relief above the speculative level, on the
assumption that all of the allegations in the complaint are
true."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

6

Accordingly, a party must "nudge[] their claims across the line from conceivable to plausible" so that a claim to relief is "plausible on its face" to survive a Rule 12(b)(6) motion to dismiss.  Id. at 570.

Should allegations in the complaint conflict with an exhibit attached pursuant to Fed. R. Civ. P. 10(c), the exhibit prevails.  Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991).  Accordingly, "the Court need not accept as true conclusions or inferences from the complaint that are contradicted by the attached exhibits." Space Tech. Dev. Corp. v. Boeing Co., 209 F. App'x 236, 238 (4th Cir. 2006).

### III.  DISCUSSION

A. Motions to dismiss Counts I and II

Defendant CMAA moves to dismiss Count I, in which USGLI alleges that CMAA breached the CMAA contract by forming and promoting CMAA University.  Defendant SCI moves to dismiss Count II, in which USGLI alleges that SCI tortiously interfered with the CMAA contract when it "unlawfully induced" CMAA to breach the CMAA contract, again through the creation of CMAA University.  Because both counts turn on whether plaintiffs have plausibly pleaded a breach of the CMAA contract, these counts will be discussed together.  For the reasons discussed below, Counts I and II will be dismissed.

7

To state a prima facie case of tortious interference with contract under Virginia law,[4] a plaintiff must show: (1) the existence of a valid contract or business expectancy; (2) that the interferor knew of the contractual relationship or expectancy; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) damage to the party whose relationship or expectancy was disrupted. Dunn, McCormack & MacPherson v. Connolly, 281 Va. 553, 558-59 (2011). To state a claim for breach of contract (which is, as noted, a requirement for a tortious interference claim), "a plaintiff must allege: (1) existence of a contract; (2) performance or offers by plaintiff to perform under the contract; (3) defendant failed to perform under the contract or breached the agreement; and (4) the breach caused actual damage to plaintiff." HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., 737 F. Supp. 2d 533, 541 (E.D. Va. 2010) (Lee, J.).

A contract is interpreted according to its plain meaning if its terms are clear and unambiguous. Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 463 S.E.2d 661, 664 (Va. 1995). Whether a contract is ambiguous is a matter of law. Commonwealth Group-Winchester Partners, L.P. v. Winchester

---

[4] Pursuant to a choice of law provision in Section X(f) of the contract, the CMAA contract is governed and interpreted according to Virginia law. The parties have not argued that Virginia law does not apply to the claim that SCI tortiously interfered with the CMAA contract.

Warehousing, Inc., 332 F. App'x 913, 919 (4th Cir. 2009).  "If contract language is capable of being understood in more than one way, it is ambiguous."  Id.  Importantly, however, "[t]he Court will not render contracts ambiguous merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement."  Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship, 698 F. Supp. 2d 602, 614 (E.D. Va. 2010) (Cacheris, J.) (internal quotation omitted).

Plaintiff's claim for breach of the CMAA contract is based on its contention that the contract created an exclusive relationship between USGLI and CMAA, requiring CMAA to utilize the CLI as its exclusive online learning platform.  Compl. ¶¶ 28, 51.  Plaintiff alleges that this purportedly exclusive agreement was breached when CMAA partnered with SCI to promote and operate CMAA University, which plaintiff characterizes as a competing online learning platform.  Id.

Defendants counter that plaintiff has not pleaded facts that support a claim for breach of the CMAA contract.  SCI Mem. at 2.  Specifically, defendants argue that there can be no breach due to the operation of CMAA University, because the CMAA

contract did not require that CMAA use the CLI as its only

online learning platform.   Id.[5]

The strongest evidence of non-exclusivity is the language

of the CMAA contract itself, which fails to explicitly describe

an exclusive agreement, and fails to use the word "exclusive" to

refer to the nature of the relationship between the parties.

Obviously the drafters knew how to use the term "exclusive,"

because the term appears elsewhere in the contract when

referring to other subjects.   See, e.g., CMAA contract §§ IV(a)-

(b) (relating to USGLI's "non-exclusive" right to use CMAA marks

(emphasis added)).   At other points, the contract uses modifiers

like "solely" as well as "exclusive" to qualify subsequent

terms.   See, e.g., CMAA contract § VII(d) ("[A]ny specific Other

Knowledge Center developed solely by CMAA…shall remain the

exclusive property of CMAA…." (emphasis added)).   Such language

indicates that, had the drafters of the contract intended to

---

[5] Both parties cite to statements by the Court and counsel at the
preliminary injunction hearing held on September 23, 2011.   See,
e.g., Pl.'s Resp. to CMAA at 5 (quoting the Court's statement
that "[t]he contract is not explicitly clear.   I think the
contract is ambiguous.   It's ambiguous based upon the argument
that the plaintiff has made that it called for an exclusive
relationship."); CMAA Mem. at 6, 7 (quoting the Court's
statement that "I don't see how you can come in and argue that
what you-all negotiated was this exclusive online learning
relationship...." and plaintiff's counsel's statement that "[w]e
don't think the contract is ambiguous").   However, such
statements were based on a record compiled quickly for an
emergency hearing, and the Court does not consider itself bound
by any such preliminary observations.

create an exclusive relationship, they would have stated so explicitly.

In arguing that the parties had created an exclusive relationship, plaintiff primarily relies on Section X(a) of the CMAA contract, which states that, if the contract is terminated due to default by USGLI,

> CMAA shall be relieved from any and all restrictions and limitations contained in this agreement, and CMAA may proceed with any educational programs it deems appropriate to meet the needs of its members, except that, upon termination of this agreement, CMAA agrees that it will not enter into agreements to create an on-line learning platform similar to the USGLI/CLI platform for a period of one year (emphasis added).

Plaintiff first argues that the provision relieving CMAA of restrictions and limitations necessarily implies that an exclusivity limitation exists. Pl.'s Resp. to SCI at 5. However, as defense counsel persuasively argued during oral argument, the contract is replete with restrictions and limitations imposed on CMAA apart from any purported exclusivity. See, e.g., CMAA contract § III(c) (imposing specific marketing requirements on CMAA, such as identifying USGLI as the provider of the CLI training materials).

Plaintiff further argues that because Section X(a) prohibits CMAA from "agreeing to create an on-line learning platform similar to the USGLI/CLI platform for one year" after the contract terminates, it similarly prohibits such conduct

11

during the pendency of the contract, because a contrary reading would "lead to [an] absurd result." Pl.'s Resp. to SCI at 6. As the Court observed during the preliminary injunction hearing, relying on what the parties agreed to do after the contract was terminated, is "a very strange way of trying to argue what was in a contract." See SCI Mem. at 9 (quoting hearing transcript). It would certainly be odd for parties to enter into an exclusivity arrangement without making its exclusive nature readily apparent. Contorting contractual provisions regarding post-termination conduct to prove an exclusive relationship during the pendency of the contract is thus an unnatural reading of the contract.

Lastly, plaintiff contends that other provisions in the contract support its claim of exclusivity. For example, plaintiff points to Section II(b), which states that the CLI "will be the infrastructure for future partnering opportunities…." (emphasis added). Plaintiff claims that such language "evince[s] an intent that the Club Learning Institute would be the only on-line platform targeted to CMAA members." Pl.'s Resp. to SCI at 7. This argument fails because it ignores the language of the preceding provision of Section II and misreads the stated intent of the parties for entering into the contract. Section II, titled "Scope of Work," states at II(a) that "USGLI will provide a website platform, through its Club

12

Learning Institute, to educate and train various constituencies associated with CMAA member clubs with current and future content" (emphasis added).  The contract's use of the indefinite article "a" is clear evidence that the parties did not intend for the CLI to provide the only website platform for educating and training CMAA members.  Section II(a) goes on to provide that the CLI will be

> comprised of a variety of modules, or 'Knowledge Centers,' which shall include, but not be limited to, the following modules: Risk Management, Staff Training [sic] Board Orientation.  The initial offering will be USGLI's currently available Risk Management Module, which shall be referred to as the core offering for USGLI's CLI platform.... (emphasis added).

Section II(a), along with the Background portion of the contract, clearly establish that when the parties entered into the CMAA contract the only module ready for marketing to CMAA members was the Risk Management Module, which the parties agreed to market.  They also agreed to market "other jointly developed training modules...under a platform to be called Club Learning Institute."  See Background Section.  When Section II(b), upon which plaintiff relies to argue that the contract made USGLI the exclusive provider of online education, is read in the context of the contract's Background and Section II(a), it is clear that describing the CLI platform as "the infrastructure" must be understood as limited to the infrastructure for future partnering opportunities between plaintiff and defendant, and

not as the infrastructure for every online training project defendant wanted to pursue.  Moreover, Section II(b) only requires the CLI platform to serve as the infrastructure for partnering opportunities "as determined and agreed to by both parties."  Given this language, if either party chose not to pursue a partnering opportunity with the other, the CLI platform would not apply to a third party partnership.

For these reasons, the Court declines to read into the CMAA contract an exclusivity provision that clearly does not exist, and therefore finds that the CMAA contract is unambiguous.[6] Accordingly, defendants' motions to dismiss Counts I and II are granted because plaintiffs have failed to state a plausible claim upon which relief can be granted.

B. Motion to dismiss Count V

In Count V, plaintiff WJK alleges that CMAA unlawfully induced SCI to breach the SCI contract when CMAA worked with SCI in forming CMAA University.  Under Florida law, a claim for tortious interference with a contractual relationship requires

---

[6] Plaintiff alleges that the CMAA contract has been renewed and is in effect until October 1, 2012.  Compl. ¶ 22.  Based on that allegation, the post-termination non-compete provision of Section X(a) does not apply at this time.  Should the contract terminate at a later date, a factual dispute may exist as to whether CMAA University is sufficiently "similar to the USGLI/CLI platform" to render CMAA in breach of the non-compete requirement.  The Court's ruling in this Memorandum Opinion does not foreclose plaintiffs from enforcing the restriction in Section X(a) in the event the contract is terminated and the facts support a claim of breach.

(1) the existence of a contract; (2) that the defendant knew of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) absence of justification or privilege; and (5) damages due to the breach. Johnson Enters. of Jacksonville v. FPL Group, Inc., 162 F.3d 1290, 1321 (11th Cir. 1998); see also Dunn, McCormack & MacPherson v. Connolly, 281 Va. 553, 558-59 (2011).[7] Breach of contract requires (1) the existence of a contract; (2) a material breach of the contract; and (3) resulting damages. Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009). In order for a contract to be enforceable, the parties must mutually agree on all of its material terms. Uphoff v. Wachovia Sec., LLC, 2009 U.S. Dist. LEXIS 116679, at *7 (S.D. Fla. Dec. 15, 2009). If the agreement between the parties is unenforceable, there can be no tortious interference. See Mariscotti v. Merco Group at Akoya, Inc., 917 So. 2d 890, 892 (Fla. Dist. Ct. App. 2006).

In support of its motion to dismiss, CMAA claims that the SCI contract is unenforceable for indefiniteness, because it did

---

[7] Pursuant to its choice of law provision, the SCI contract is governed and construed according to the laws of Florida. See SCI contract § 9(d). Because tortious interference with contract under both Florida and Virginia law requires the existence of a valid contract, the Court need not decide whether the choice of law provision applies to the tortious interference standard as well as to interpretation of the SCI contract.

15

not include material price terms.[8]  Plaintiff initially argues
that the law does not favor invalidating contracts due to
uncertainty and "will, if feasible, so construe agreements as to
carry into effect the reasonable intentions of the parties if
that can be ascertained."  Blackhawk Heating & Plumbing Co. v.
Data Lease Fin. Corp., 302 So. 2d 404, 409 (Fla. 1974) (internal
quotation omitted).

In this case, two price terms are at issue: the commissions
WJK was to receive for referring clients to SCI and the cost of
the year of CLI access SCI would purchase on behalf of CMAA
member clients.  The amount of a commission constitutes a
material price term that must be included in the contract for
the contract to be enforceable.  See Drost v. Hill, 639 So. 2d
105, 106 (Fla. Dist. Ct. App. 1994) (noting that price is a
material term); Uphoff v. Wachovia Sec., LLC, 2009 U.S. Dist.
LEXIS 116679, at *7-8 (S.D. Fla. Dec. 15, 2009) (holding amount
of a bonus to be paid to be a material price term and dismissing
breach of contract claim when "the Complaint d[id] not provide a
specifically agreed upon amount nor d[id] it provide a method
for calculating an amount of the bonus").  The term is
particularly critical in this case, in which the contract,

---

[8] CMAA also argues that plaintiff has not pleaded a plausible
claim for relief because the terms of the contract plainly show
that there has been no breach of the exclusivity provision.
Because the Court finds the SCI contract unenforceable, there is
no need to address CMAA's argument.

16

titled "Independent Sales Producer Agreement," revolves around

the referral arrangement, in which WJK promised to "market and

promote" and "procure clients for" SCI in exchange for

commissions.  SCI contract § 2; Pl.'s Resp. to CMAA at 9.[9]

Although the documents submitted with plaintiff's complaint

demonstrate that the amount of the commissions due to WJK was

not included in the contract or agreed to by the parties, the

contract could avoid being found indefinite if it provides for

an "objective method of determining price."  <u>Bee Line Air</u>

<u>Transport, Inc. v. Dodd</u>, 496 So. 2d 874, 875 (Fla. Dist. Ct.

App. 1986) (citing <u>Blackhawk</u>, 302 So. 2d 404).  Section 5(b) of

the SCI contract provides:

> <u>Commission Calculation:</u> PMG and Producer understand and
> agree that commissions shall be determined on a client-by-
> client basis and calculated considering client bill rates,
> profitability, industry and other reasonable business

[9] Plaintiff argues that the two obligations on which it is suing, SCI's obligation to "exclusively promote" the CLI and to provide one free year of the CLI to CMAA member clients, are sufficiently definite to be enforceable, despite the absence of a price term.  Pl.'s Resp. to CMAA at 11.  Regardless of the definiteness of certain provisions, the entire contract is unenforceable once the Court determines that it is missing a material term.  <u>See</u> <u>Drost v. Hill</u>, 639 So. 2d 105, 106 (Fla. Dist. Ct. App. 1994) ("A meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract, and where it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting of the minds.") (quoting <u>Cent. Props., Inc. v. Robbinson</u>, 450 So. 2d 277, 280 (Fla. Dist. Ct. App. 1984) (internal alteration omitted)).

> conditions and factors. For each client procured by
> Producer for SCI, Producer and PMG shall set forth the
> commission calculation structure on a "Commission
> Worksheet" in the form attached hereto as "Exhibit A."

Defendant argues that Exhibit A was never created, and points

out that Exhibit A has not been attached to the complaint or

submitted with plaintiffs' papers.   CMAA Mem. at 11.

Plaintiff's unacceptable response to the absence of Exhibit A is

that "the contents of Exhibit A, and the parties' understanding

of what Exhibit A was supposed to provide, are issues for

discovery."   Pl.'s Resp. to CMAA at 11 n.6.   Because Exhibit A

has not been presented in this litigation, the Court finds that

Exhibit A does not exist and that neither the commission pricing

nor a method for calculating such pricing is included in the SCI

contract.[10]

---

[10] Plaintiff relies on Saxelbye Architects, Inc. v. First
Citizens Bank & Trust Co., 1997 U.S. App. LEXIS 30320, at *1
(4th Cir. Nov. 3, 1997), in which the Fourth Circuit, applying
Florida law, reversed the district court's Rule 12(b)(6)
dismissal based on indefiniteness of a contract.   Saxelbye is
distinguishable from the current action; there, the court found
that the missing prices for stages of a building project could
not have been included in the contract at the time of formation,
because costs were necessarily contingent on the progress of the
project.   Id. at *8.   Unlike the SCI contract, the contract in
Saxelbye included a fee schedule with some specific formulas for
calculating the price for several of the phases of the project;
the definiteness issue related only to certain other phases.
Id. at *7.   In coming to its decision, the court held that "[i]f
the parties provide a practicable, objective method for
determining this price or compensation, not leaving it to the
future will of the parties themselves, there is no such
indefiniteness or uncertainty as will prevent the agreement from

Plaintiff argues that the "parties themselves determined that the pricing of commissions was not an essential term of the contract" because they entered into the contract with commissions to be determined on a client-by-client basis.  Pl.'s Resp. to CMAA at 11.  According to plaintiff, "if SCI had deemed certainty in the pricing of commissions to be an essential requirement of entering into the SCI Contract, it could have, and would have, specified such terms."  Id.  This argument is entirely unpersuasive because, taken to its logical conclusion, it could render any term "immaterial" merely because it was omitted from the contract.  If this were the case, there would be no basis to ever invalidate a contract for indefiniteness, because the fact that a term was missing would itself preclude such a finding.  This argument is clearly not tenable.

Lastly, plaintiff argues that its course of conduct in performing under the contract suffices to fill in the missing commission term.  See, e.g., Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams, 856 So. 2d 1, 5 (Fla. Dist. Ct. App. 2003) ("Where an agreement is ambiguous, the meaning of the agreement may be ascertained by looking to the

---

being an enforceable contract."  Id. at *6 (quoting Corbin on Contracts, Vol. I (1963), § 97, at 424).  In contrast, the SCI contract provides, at best, only bare-bones guidance on how commissions are to be calculated, and includes open-ended language, such as "other reasonable business conditions and factors," rendering the calculation of commissions entirely undefined in the contract.

19

interpretation that the parties have given the agreement and the parties' conduct throughout their course of dealings."). Plaintiff points to the only client WJK obtained for SCI and the parties' subsequent agreement on a .5% commission rate for that client. Pl.'s Resp. to CMAA at 15. This evidence is insufficient to fill in the missing price term. First, the specified client was procured on March 15, 2010, before the date of the contract and before the agreement was signed by either party.[11] See Def.'s Reply at 5; SCI contract. As defendant correctly notes, "[a] party cannot perform under a contract that does not yet exist." Id. Moreover, even if the contract had been in existence at the time the client was obtained (or the two events were "largely contemporaneous" as plaintiff argues, see Pl.'s Resp. to CMAA at 15 n.9), this single event would not establish a course of performance under the contract sufficient to fill in the material price term. There is no indication that .5% is the standard commission rate or that the parties contemplated that it would apply to all clients. To the contrary, the contract's provision that commissions were to be determined on a case-by-case basis suggests that the commission rate would not necessarily be the same for every client referred by WJK.

---

[11] The contract is dated March 18, 2010 and WJK signed on that date. SCI signed the contract on April 1, 2010.

In addition to being indefinite as to commissions, defendant claims that the contract is missing an additional material price term.  Section 3(b) of the contract requires that SCI will pay for one year of the CLI for each CMAA member client and, in turn, provide one free year of the CLI to that CMAA member.  Again, no price term is included.

Plaintiff contends that "a contract does not need to specify exact pricing where the pricing can be obtained from referencing other sources, or where it is reasonably ascertainable."  Pl.'s Resp. to CMAA at 12 (citing cases).  In this case, plaintiff argues that the CMAA contract (between USGLI and CMAA) defines the pricing of the CLI for CMAA members and therefore fills in the price term of the contract between WJK and SCI.  See Pl.'s Resp. to CMAA at 12; CMAA contract § V(a).  Plaintiff's effort to utilize the CMAA contract to fill in a missing material term in the SCI contract must be rejected. The CMAA agreement was between two different parties than those to the SCI contract.  It referenced the fee that new CMAA members were to pay USGLI for use of the CLI, in the context of the marketing agreement between the parties to the CMAA contract.  It is not at all clear that the same fee structure would apply when SCI purchased the CLI on behalf of clients, pursuant to the SCI contract.  Moreover, the SCI contract was executed in March 2010, eight months before the CMAA contract at

issue in this case. For these reasons, the two contracts should not be construed as one. See Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1067 (11th Cir. 2004) ("[W]here two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract.") (internal quotation and citation omitted) (emphasis added). Moreover, the SCI contract does not mention the CMAA contract, and it is therefore not incorporated by reference. See Eli Lilly & Co. v. Air Express Int'l USA, Inc., 615 F.3d 1305, 1316 (11th Cir. 2010).

For all of these reasons, the Court finds the SCI contract to be unenforceable due to indefiniteness.

## IV. CONCLUSION

Because the plaintiffs have failed to plead sufficient facts to make out plausible claims for breach of and tortious interference with the CMAA contract, and because the SCI contract is too indefinite to be enforced, defendants' motions to dismiss counts I, II, and V will be GRANTED by an Order to accompany this Memorandum Opinion.

Entered this _15th_ day of November, 2011.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

22